UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------X

DAVID VERED,                                    **MEMORANDUM AND ORDER**

                                                14-CV-4590 (KAM)

                    Plaintiff,

        -against-


CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.

---------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

        Pursuant to 42 U.S.C. § 405(g), plaintiff David Vered ("plaintiff") appeals the final decision of defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("defendant"), who denied plaintiff's application for Social Security Disability Insurance ("SSDI") under Title II of the Social Security Act ("the Act"). Plaintiff brings this action seeking judicial review of the Social Security Administration ("SSA") decision that he was not disabled because he did not have medically determinable severe medical impairment(s) that lasted or could have lasted for a continuous period of at least twelve months from January 1, 2002, the alleged onset date, through December 31, 2005, the date last insured. For the reasons stated herein, defendant's

motion for judgment on the pleadings is **GRANTED**, plaintiff's cross-motion for judgment on the pleadings is **DENIED**, and the decision of the Commissioner is **AFFIRMED.**

BACKGROUND

I. **PROCEDURAL HISTORY**

Plaintiff filed an application for SSDI benefits on February 22, 2011, alleging that he had been disabled since January 1, 2002 due to a back disorder, herniated disc, arthritis, vision problems, leg problems, and memory problems. (Tr. 260.)[1] On March 24, 2011, the SSA denied plaintiff's application finding he was not disabled. (Tr. 144.)

On July 22, 2011, plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 150-51.) The request was granted and the hearing ("Initial Hearing") was held on June 27, 2012, before ALJ Jay Cohen. (Tr. 77-103.) After the Initial Hearing, the ALJ sent interrogatories to medical expert Karl Manders, M.D., which Dr. Manders completed. (Tr. 627.) The ALJ served the completed interrogatories on plaintiff and indicated that the completed interrogatories would be added to the record. (Tr. 282-83.) On September 11, 2012, plaintiff requested a supplemental hearing to cross-examine the medical expert, testify and to submit additional evidence. (Tr. 42-44.) The supplemental

---

[1] Citations to the certified administrative record (1-670) are indicated by the abbreviation "Tr."

hearing was held on November 28, 2012 ("Supplemental Hearing"), where both plaintiff and the medical expert testified.  (Tr. 104-42.)

In a decision issued on January 14, 2013, the ALJ found that plaintiff was not disabled, as defined by the Act, from January 1, 2002, the alleged onset date, through December 31, 2005, the date last insured (hereinafter "the date last insured").[2]  (Tr. 35.)  The ALJ applied the five-step evaluation process for determining whether an individual is disabled, but ended the analysis at Step Two after finding that plaintiff's impairments were not severe.  (Tr. 35); *see also* 20 C.F.R. § 404.1520(a).

Plaintiff appealed the ALJ's decision to the Appeals Council on March 14, 2013.  (Tr. 7-23.)  On June 6, 2014, the Appeals Council denied plaintiff's request for review and the ALJ's decision became the Commissioner's final determination.  (Tr. 1-6.)  This appeal followed.

On July 31, 2014, plaintiff filed the Complaint in this action.  (*See* ECF No. 1.)  On October 29, 2014, defendant filed its Answer.  (*See* ECF No. 9.)  On March 19, 2015, the parties filed their motion and cross-motion for judgment on the pleadings.  (*See* ECF Nos. 12-21.)

---

[2] The parties do not dispute that plaintiff last met the Social Security Act's insured status requirements on December 31, 2005.  (Tr. 29.)

## II.  NON-MEDICAL FACTS

Plaintiff was born on March 19, 1953 and he resides in Queens, New York.  (Tr. 256, 259.)  He was 48 years old as of the alleged onset date of his disability, January 1, 2002.  (Tr. 256.) Plaintiff can speak, and generally understands English, but cannot read or write English.  (Tr. 79, 83, 259.)  At the Initial Hearing, plaintiff was assisted by a Hebrew interpreter and stated that he had lived in the United States for the past thirty-three years and owned a locksmith business.  (Tr. 81, 83.)  At the Supplemental Hearing, plaintiff testified that he passed the United States citizenship test, which was administered in English.  (Tr. 108-09.)  During plaintiff's visit to the New York Ear and Eye Infirmary on March 4, 2011, plaintiff mentioned that he did not need a medical interpreter.  (Tr. 332.)

Plaintiff reported in his disability application that he completed twelfth grade in 1970.  (Tr. 261.)  But, at the Initial Hearing, plaintiff testified that the last grade he completed was the sixth grade; he also testified that he completed a three month welding course, shortly before immigrating to the United States, approximately thirty-three years earlier.  (Tr. 81-82, 94.)

Plaintiff worked as a locksmith from 1989 to 2000.  (Tr. 82-83, 260-61.)  During the last four or five years that he worked, plaintiff managed a locksmith business where he supervised one employee.  (Tr. 83-84, 108-09.)  While managing the business,

plaintiff's responsibilities included ordering supplies, communicating in English with customers, and advertising for the business. (Tr. 83-84.) Plaintiff closed the business in 2000. (Tr. 83-84.) In the fifteen years prior to claiming disability, plaintiff only worked as a locksmith. (Tr. 261.)

After plaintiff began feeling pain but prior to December 31, 2005, the date last insured, plaintiff testified that he would spend all day at home; he watched television and read while lying down. (Tr. 90.) He further testified that he did not cook, or clean his apartment, or do any shopping. (*Id.*) Plaintiff stated he could drive a car, but not every day, and that he did not use public transportation and his wife took him to all his doctors' appointments. (Tr. 90-91.) Plaintiff testified that he did not do anything for recreation, but his brother sometimes would take him to visit friends or family. (*Id.*)

Plaintiff's earnings record shows that he acquired sufficient quarters of disability coverage to remain insured through December 31, 2005. (Tr. 27, 247-253.) Plaintiff did not seek treatment or engage in physical therapy while he traveled abroad for six months during 2006. (Tr. 525.)

**III. MEDICAL FACTS**[3]

  **i.  Plaintiff's Testimony Regarding His Symptoms**

At the Initial Hearing, plaintiff testified that he could not work starting January 1, 2002, because he had fallen on the sidewalk "at that time" and injured his "entire back," and was unable to work thereafter.  (Tr. 85.)  Plaintiff testified that prior to December 31, 2005, he had surgery on his knee and on a cataract.  (Tr. 88-89.)  Plaintiff stated that he started seeing Dr. Richard A. Gasalberti, M.D. in 2005 for neck and back pain, and was administered "numbing injections" as well as a pain treatment that "burned" his veins.  (Tr. 87-88.)  Plaintiff also stated that, on or before December 31, 2005, his "spinal cord" injury caused him pain which traveled down his legs, and that he felt persistent pain in his back at all times.  (Tr. 85, 87.)  He testified that, prior to December 31, 2005, he could walk and stand for fifteen minutes, sit for twenty minutes, and that he could lift a maximum of ten to fifteen pounds.  (Tr. 86-87.)

Plaintiff initially testified that he did not have any problems with carpal tunnel syndrome prior to December 31, 2005.

---

[3] Although the court reviewed the entire record, the analysis discusses the medical facts pertaining to period from the alleged onset date (January 1, 2002) through the date last insured (December 31, 2005) and the twelve months thereafter (up to December 31, 2006), because plaintiff must prove that he had sufficiently severe medical impairment(s) that lasted or could have lasted for a continuous period of at least twelve months during the relevant period.  *See* Social Security Ruling ("S.S.R.") 82-52.  As discussed in greater detail herein, plaintiff failed to carry his burden of establishing a medically severe impairment that met the SSA's durational requirement prior to December 31, 2005.

(Tr. 88-89.)  But, upon questions from his attorney, plaintiff testified that he started seeing Marc Silverman, M.D., in 2004, not only for pain in his back and neck, but also because he had pain in his hands that prevented him from holding a cup of coffee.[4] (Tr. 92-93.)  Plaintiff also stated that in 2004, he was unable to pick up a gallon of milk due to "really bad pain" in his hands and legs.  (Tr. 94.)

Plaintiff testified that he had no mental health problems prior to December 31, 2005, but was prescribed Valium by a family doctor for stress.  (Tr. 89.)  He also reported that he "always received pain medication" and that the pain medication made him drowsy and caused him to fall asleep; this sleep, however, was not restful.  (Tr. 96.)  Plaintiff further stated that, on and before December 2005, he could not sleep through the night because of the pain despite taking pain medications.  (Tr. 96-97.)

## ii.  Medical Evidence

### i. Treating Relationship with Marc Silverman, M.D.

On March 5, 2004, plaintiff first visited orthopedic surgeon Marc Silverman, M.D., with complaints of lower back pain and pain running down his left leg for the past seven or eight

---

[4] One of the symptoms of Carpal Tunnel Syndrome is "[d]ecreased grip strength [that] may make it difficult to form a fist, grasp small objects, or perform other manual tasks."  National Institute of Neurological Disorders and Stroke, *Carpal Tunnel Syndrome Fact Sheet*, http://www.ninds.nih.gov/disorders/carpal_tunnel/detail_carpal_tunnel.htm, (last visited February 14, 2017).

months. (Tr. 326-27.) Plaintiff indicated no history of injury or trauma. (Tr. 318.) Dr. Silverman's physical examination indicated that plaintiff had pain on lumbar flexion and that plaintiff could toe and heel walk.[5] (Tr. 327.) Dr. Silverman diagnosed "L4-L5" degenerative disc disease with recommended physical therapy and ice. (Tr. 318.) Dr. Silverman also recommended an electromyography ("EMG") study. (Tr. 327.) The EMG, taken on March 9, 2004, was compatible with mild right median sensory and mild bilateral tibial motor nerve compromise. (Tr. 318, 320-25.) The x-rays of plaintiff's cervical spine, taken on March 29, 2004, were within normal limits. (Tr. 328.)

On March 29, 2004, plaintiff returned to Dr. Silverman, reporting that he had undergone physical therapy, but still had pain in his neck. (Tr. 318-19.) Examination of his neck showed more "pain on flexion" than on extension, and Dr. Silverman noted that plaintiff's reflexes appeared to be intact. (Tr. 319.) Dr. Silverman recommended continued physical therapy for plaintiff's neck and back, but added physical therapy for plaintiff's cervical spine, a visit to a neurologist, a right wrist splint, and a change of medication to Relafen tablets. (*Id.*) Dr. Silverman also noted that if there was no improvement in plaintiff's right wrist, a right carpal tunnel release would be considered, and if plaintiff

---

[5] Inability to walk on the heels or toes may be evidence of significant motor loss. *See* 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00(E)(1).

saw no improvement in his back or neck, a referral to a spine surgeon would also be considered. (*Id.*)

On September 13, 2004, five months later, plaintiff returned to Dr. Silverman and reported "a lot of pain in [plaintiff's] neck and his back." (Tr. 329.) Dr. Silverman noted that "[plaintiff] has not yet worn the wrist cock-up splint" as previously recommended. (*Id.*) Dr. Silverman again recommended the use of a wrist cock-up splint and recommended that plaintiff visit a spine surgeon. (*Id.*) In a letter dated July 19, 2011, Dr. Silverman stated that plaintiff had been under his care from March 5, 2004 through September 13, 2004 and that plaintiff was "totally disabled from work during this period due to his injuries." (Tr. 340.)

### ii. Treating Relationship Richard Gasalberti, M.D.

On October 31, 2005, more than a year after plaintiff's last visit to Dr. Silverman, plaintiff went to sports medicine and rehabilitation specialist, Dr. Richard A. Gasalberti, M.D. for an initial consult. (Tr. 559-63.) Plaintiff reported that, two or three weeks earlier, he bent down to pick something up and developed pain in his lower back with radicular symptoms to both feet. (Tr. 559.) He reported that the pain was worse with activity and relieved with rest but medication did not alleviate his pain. (*Id.*) Plaintiff also complained of neck pain for the past two weeks, with radicular symptoms to both upper arms and nocturnal

symptoms. (*Id.*) Plaintiff denied prior significant medical problems or history of injury to the neck or back. (*Id.*)

Dr. Gasalberti found that plaintiff was alert and fully oriented with normal memory. (Tr. 561.) Plaintiff's cervical ranges of motion were restricted.[6] Plaintiff had functional ranges of motion in the upper extremities, hips, knees, and ankles. (Tr. 561.) Sensation was intact in plaintiff's upper extremities. Plaintiff had full strength (5/5) in his upper and lower extremities, and plaintiff's deep tendon reflexes of the triceps, biceps and brachioradialis were symmetrical. (*Id.*) From these findings, Dr. Gasalberti diagnosed plaintiff with a history of chronic low back pain, re-exacerbation, and lumbar myofascial pain syndrome; he noted that bilateral lumbar radiculopathy and cervical radiculopathy needed to be ruled out. (Tr. 562.) Dr. Gasalberti recommended Magnetic Resonance Imaging ("MRI") of plaintiff's cervical and lumbar spines, and an EMG study of plaintiff's upper and lower extremities. (*Id.*) Dr. Gasalberti prescribed: Naprosyn, Vicodin, Lidoderm, a lumbosacral corset for support, moist heat, Ben Gay, wrist splints, and physical therapy. (*Id.*)

---

[6] Plaintiff's cervical ranges of motion were as follows: 70 degrees on the right and left, 35 degrees of flexion and extension. (Tr. 561.) Whereas, the average range of cervical spine motion is: flexion to 50 degrees, lateral flexion to 45 degrees, and lateral rotation to 80 degrees. American Medical Association, *Guides to the Evaluation of Permanent Impairment (AMA Guides)* 118 (4th ed. 1994).

On November 3, 2005, on recommendation by Dr. Gasalberti, Jeffrey Chess, M.D., performed MRIs on plaintiff's lumbar and cervical spines. (Tr. 555-58.) From the MRI of the lumbar spine, Dr. Chess gave the following impression: "There [was] anterior and posterior bulge of the L3/4 intervertebral disc effacing the thecal sac. There [was] left posterior herniation of the L4/5 intervertebral disc impinging upon the left lateral recess." (Tr. 556.) From the MRI of the cervical spine, Dr. Chess gave the following impression: "There [was] anterior and posterior bulge of the C4/5 intervertebral disc impinging upon thecal sac with a superimposed right posterolateral herniation impinging upon the right lateral recess." (Tr. 558.) There was anterior and posterior bulge of the C5/6 intervertebral disc impinging upon thecal sac. There was mild stenosis of the spinal canal at levels C4/5 and C5/6. (*Id.*) Dr. Chess also determined that there was straightening of the cervical lordosis, which may have been secondary to the presence of pain and/or muscle spasm; he recommended a clinical correlation for this impression. (*Id.*)

Dr. Gasalberti also conducted Duplex Doppler tests on plaintiff's lower extremity arteries, abdominal aorta and inferior vena cava, and lower extremity veins on November 3, 2005. (Tr. 554.) Dr. Gasalberti concluded that all three tests showed "normal" function. (*Id.*)

On November 5, 2005, Dr. Gasalberti administered an EMG

nerve conduction study ("EMG/NCS"). (Tr. 551-553.) The nerve conduction study on plaintiff's peripheral neuromuscular system showed "normal electrodiagnostic examination of the upper extremities without evidence of cervical radiculopathy, myopathy, peripheral polyneuropathy or carpal tunnel syndrome." (Tr. 552.)

On November 10, 2005, Dr. Gasalberti reviewed the EMG/NCS, and the MRIs of the cervical spine and lumbosacral spine, and diagnosed: "History of chronic low back pain, bulging disc, L3-4 disc herniation, L4-5, with L4-5 and L5-S1 radiculopathy. Neck pain, disc bulging C4-5, C5-6, clinical cervical radiculopathy." (Tr. 550.) Dr. Gasalberti noted that the "[l]ong-term goals include increased range of motion, decreased pain and muscle spasm, increased strength." (*Id.*) Dr. Gasalberti recommended continued use of Naprosyn, Lidoderm, Vicodin, a lumbosacral corset and cock-up splints for support, and physical therapy. (*Id.*) He also sought authorization for three epidural steroid injections to the lumbar spine. (*Id.*)

Beginning on December 2, 2005, Dr. Gasalberti administered lumbar epidural steroid injections on plaintiff. (Tr. 547-48.) After the injections, Dr. Gasalberti examined plaintiff and found that there was no alteration of plaintiff's motor and sensory function, and plaintiff was neurologically intact. (Tr. 548.) On December 6, 2005, plaintiff returned to Dr. Gasalberti and reported that the pain was reduced to five out

of ten. (Tr. 549.) Manual muscle testing of the lower extremities showed full strength. (*Id.*) Dr. Gasalberti's impressions on December 6, 2005 were that plaintiff had a history of chronic low back pain, bulging disc, L3-4, disc herniation, L4-5, with L4-5 and L5-S1 radiculopathy. Neck pain, disc bulging C4-5, C5-6, clinical cervical radiculopathy and that plaintiff showed "mild-to-moderate overall improvement" after receiving the first series of epidural injections. (*Id.*) Dr. Gasalberti treatment recommendations were the same as his recommendations on November 10, 2005, except Dr. Gasalberti also recommended that plaintiff receive a second series of transforaminal epidural steroid injections. (*Id.*)

On December 9, 2005, plaintiff received a second series of lumbar epidural injections and the examination showed that plaintiff did not experience any "alteration of motor and sensory function." (Tr. 545-46.) On December 10, 2005, plaintiff returned to Dr. Gasalberti and reported that there was "residual mild discomfort at the injection site," but experienced mild to moderate improvement of radicular symptoms. (Tr. 544.) Dr. Gasalberti's impressions and recommendations after the December 10, 2005 examination were largely the same as his November 10, 2005 and December 6, 2005 impressions and recommendations. (*Id.*)

On December 16, 2005, Dr. Gasalberti administered a third set of lumbar epidural injections and again found that there

was no alteration of plaintiff's motor and sensory function and that plaintiff remained neurologically intact. (Tr. 542-43.) On December 19, 2005, plaintiff returned to Dr. Gasalberti and reported that "[o]n a pain scale of 1-10, 10 being the worst, [plaintiff felt] about an 8." (Tr. 540.) Examination showed tenderness of the proximal coccyx and sacroiliac joints. (*Id.*) Dr. Gasalberti's impression was the same as November 10, 2005, and December 10, 2005, but for the sacroilitis diagnosis. (*Id.*) Dr. Gasalberti recommendations were also the same as November 10, 2005 and December 10, 2005, except that he also requested authorization for SI joint injections. (*Id.*)

On January 6, 2006, Dr. Gasalberti administered bilateral SI joint steroid injections. (Tr. 537-38.) At the January 9, 2006 re-evaluation, plaintiff reported that his pain was about 6 or 7 out of 10. (Tr. 539.) Dr. Gasalberti's impression was the same as his impression on December 19, 2005, except that plaintiff showed mild overall improvement in his sacroilitis symptoms after his first SI join injection. (*Id.*)

On January 13 and January 20, 2006, Dr. Gasalberti administered a second and a third series of bilateral SI joint steroid injections on plaintiff. (Tr. 535-36.) Plaintiff tolerated the procedures well. (*Id.*) On February 4, 2006, Dr. Gasalberti examined plaintiff and noted that plaintiff had received some relief after his third series of SI injections. (Tr.

533-34.) Dr. Gasalberti's impressions of plaintiff on February 4, 2006, were that plaintiff had a history of chronic low back pain, bulging disc, L3-4, disc herniation, L4-5, with L4-5 and L5-S1 radiculopathy; neck pain, disc bulging C4-5, C5-6, clinical cervical radiculopathy. (Tr. 533.) Dr. Gasalberti also noted that there may be re-exacerbation of disc herniation but found that plaintiff's sacroilitis and SI joint pain were resolved after plaintiff received the three series of SI joint injections. (*Id.*) Dr. Gasalberti also noted that plaintiff had tendinitis of the left fifth finger and possibly ganglion of the flexor tendon. (*Id.*) Dr. Gasalberti recommendations on February 4, 2006 were: a MRI of the lumbosacral spine to rule out herniated nucleus pulposus, he referred plaintiff to a neurosurgeon for a second opinion, continued physical therapy, use of the lumbosacral corset and cock-up splint, Arthrotec and Vicodin for pain management and x-rays of the left hand to rule out ganglion of the flexor tendon. (Tr. 533-34.)

On February 11, 2006, plaintiff again visited Dr. Gasalberti. (Tr. 531-32.) Dr. Gasalberti noted that the x-rays of plaintiff's left hand revealed no fracture. (Tr. 531.) The MRI of the lumbosacral spine had not been conducted at the time. (*Id.*) An examination of the left hand revealed tenderness over the flexor tendon, though plaintiff was able to make a functional fist. (*Id.*) Dr. Gasalberti also administered a series of trigger

point injections on February 11, 2006. (Tr. 532.) Dr. Gasalberti's recommendations were the same as on February 4, 2006, except Dr. Gasalberti recommended that plaintiff discontinue his use of Arthrotec and Vicodin because plaintiff complained of gastrointestinal discomfort associated with his use of the medications. (*Id.*) Dr. Gasalberti also did not order another x-ray of plaintiff's right hand. (*Id.*) At the February 11, 2006 examination, plaintiff advised Dr. Gasalberti that he was leaving the country shortly. Dr. Gasalberti advised plaintiff to schedule the recommended neurological evaluation prior to leaving the country. (*Id.*)

At Dr. Gasalberti's recommendation, Dr. Gelber administered an MRI on plaintiff's lumbosacral spine on March 24, 2006. (Tr. 529.) The MRI revealed no evidence of posterior disc protrusion. (*Id.*) At L3-4, the MRI showed an anterior disc protrusion and spur. (*Id.*) Dr. Gelber noted that the significance of the L3-4 anterior disc protrusion was best determined by clinical grounds. (*Id.*)

Plaintiff again was evaluated by Dr. Gasalberti on March 30, 2006. (Tr. 527-28.) Dr. Gasalberti noted that the MRI conducted on March 24, 2006 showed no evidence of posterior disc protrusion and showed at L3-4 anterior disc protrusion and spur. (*Id.*) He noted that the MRI conducted on November 3, 2005 revealed bulging disc, L3-4, thecal sac and L4-5 upon left lateral recess.

(*Id.*)  Dr. Gasalberti requested that plaintiff bring the November 2005 MRI to compare with the March 2006 MRI.  (Tr. 528.)  Dr. Gasalberti also recommended that plaintiff take Lyrica twice per day in addition to continued use of the Lidoderm patch, the lumbosacral corset, cock-up splint, and physical therapy.  (Tr. 527-28.)

Plaintiff was next seen by Dr. Gasalberti nine months later, on December 21, 2006.  (Tr. 525-26.)  Dr. Gasalberti noted that plaintiff was last evaluated on March 30, 2006, because plaintiff had been abroad for six months and had not returned for follow-up visits or physical therapy as he had recommended.  (Tr. 525.)  Plaintiff reported radicular symptoms to both legs, as well as pain and discomfort with lateral rotation.  (*Id.*)  On a pain scale of 1-10, with 10 being the worst, plaintiff reported that he felt about a 10 with intermittent numbness of the hands, particularly at night.  (*Id.*)  Dr. Gasalberti referred plaintiff for a neurological and orthopedic evaluation.  (Tr. 525.)  He also sought authorization for steroid injections and recommended use of Lyrica, Lidoderm patches and physical therapy.[7]  (*Id.*)

On April 11, 2012, Dr. Gasalberti completed a functional assessment for the period October 31, 2005 to the present.  (Tr.

---

[7]  Dr. Galsaberti continued to treat plaintiff after December 2006.  The court however, does not detail those treatment records as they do not pertain to the relevant period; that is, the period between the alleged onset date and the date last insured.

434-35.) Dr. Gasalberti found that plaintiff could stand and/or walk for less than one hour and could sit for less than two hours in an eight hour work day. Plaintiff could only lift or carry between five and ten pounds. (Tr. 435.) He further opined, *inter alia*, that plaintiff would: have difficulty concentrating on his work; require frequent breaks and/or bed rest; have functioning interfered with by medications; need to take an average of two or more sick days per month; and that plaintiff had environmental restrictions due to his physical limitations and/or sensitivity. (*Id.*)

### iii. Medical Expert's Testimony

On August 17, 2012, Karl Manders, M.D., a board certified specialist in pain medicine and neurosurgery, who is qualified as an expert by the SSA, answered medical expert interrogatories issued by the ALJ based on his review of the entire administrative record dating from 2004 to 2012. (Tr. 647-56.)

Dr. Manders determined that plaintiff did not have any severe physical impairments on or before December 31, 2005, and that plaintiff's only limitation was "prolonged ambulation over one hour at a time." (Tr. 647, 654.) Otherwise, Dr. Manders concluded, *inter alia*, that on or before December 31, 2005, plaintiff was capable of shopping, traveling without a companion, walking without assistance, using public transportation, climbing a few steps at a reasonable pace with the use of a single hand

rail, preparing simple meals and feeding himself, caring for his own personal hygiene, and handling paper files. (Tr. 654.)

Dr. Manders found that at "one time without interruption," plaintiff could: sit for an hour, stand for thirty minutes, and walk for thirty minutes. (Tr. 650.) He also concluded that, in an eight hour work day, plaintiff could: sit for eight hours, stand for one hour, and walk for one hour and that plaintiff "may sit [for] one hour then be allowed to stand and stretch three to five minutes each hour at [the] worksite." (*Id.*) Additionally, he also found that plaintiff could occasionally lift and carry up to ten pounds. (Tr. 649.)

Dr. Manders testified at the Supplemental Hearing on November 28, 2012. (Tr. 111-41.) At the Supplemental Hearing, Dr. Manders was questioned by plaintiff's counsel about his opinion that plaintiff had no severe impairments prior to December 31, 2005, the date last insured. Dr. Manders stated that the results of the diagnostic testing, such as x-rays, MRIs, and EMGs, that plaintiff received were not necessarily indicative of plaintiff's pain, symptoms, or functioning. (Tr. 112-13.) He explained that clinical findings made during examination and observation of the plaintiff by his doctors, especially neurological examinations, findings involving motor strength, sensation, and reflex changes, were more important in revealing the patient's condition and would need to correlate with the diagnostic testing for the diagnostic

testing to have much value.  (Tr. 113, 125.)  Dr. Manders also stated that the weight given to a patient's subjective complaints varied from patient to patient.  (Tr. 114.)

Dr. Manders clarified that the functional assessment that he provided via answers to the ALJ's interrogatories (Tr. 649-54.), concerned plaintiff's functioning after December 31, 2005.  (Tr. 115.)  Dr. Manders stated that after reviewing the record, he could not identify, nor was there evidence of, any specific limitations to plaintiff's functioning that were present prior to December 31, 2005.  (Tr. 116-17, 125-27.)

During the Supplemental Hearing, plaintiff's counsel specifically requested that Dr. Manders review the evidence from the period prior to December 31, 2005, including test results and examination findings from Drs. Silverman and Gasalberti.  (Tr. 116-17, 119-26, 129-30, 133-37, 139-40.)  Dr. Manders explained that a November 2005 EMG study showing no cervical radiculopathy and early L4/L5 and L5/S1 radiculopathy (Tr. 551-53), a November 2005 MRI showing straightening of cervical lordosis (Tr. 557-58), and a March 2004 EMG showing mild right median sensory and bilateral tibial motor nerve compromise (Tr. 320-25), were not of much value in establishing plaintiff's impairment(s) or functional limitations without clinical support such as signs of weakness and/or reflex and sensory changes.  (Tr. 119-20, 125, 129-30, 139-40.)  Dr. Manders did not think the mild findings of the 2004 EMG

resulted in a finding of significant limitations because the EMG dealt with the legs and plaintiff complained of neck and back pain. (Tr. 139-40.) Further, in 2004, plaintiff reported basically subjective complaints, and his neurological clinical examinations were negative. (Tr. 117; *see* 318-19, 326.) In December 2005, Dr. Gasalberti found that plaintiff was neurologically intact and had full (5/5) strength in his lower extremities. (Tr. 119-29; *see* Tr. 540-49.) Dr. Manders said there were no neurological findings prior to December 31, 2005, and he could not "come up with any specific limitations as far as sitting, standing, and things of that nature." (Tr. 117, 126.)

That plaintiff received lumbar epidural steroid injections and that he was prescribed Naprosyn and Flexeril prior to December 31, 2005 by Dr. Gasalberti, (*see* Tr. 540-50), also did not change Dr. Manders' opinion that plaintiff had no significant work related limitations or that plaintiff had not established the existence of a severe impairment during the relevant period from January 1, 2002 to December 31, 2005. (Tr. 121-25.) Dr. Manders testified that actual neurological deficits, rather than treatment, established limitations because treatment decisions vary widely amongst physicians; a physician's decision to take a particular treatment course is often based on the patient's subjective complaints and different physicians will often have varying views on which treatment is best. (*Id.*) Dr. Manders did

acknowledge that Dr. Gasalberti's October 31, 2005 findings of antalgic gait, restricted trunk flexion and lateral rotation, pain on neck flexion, and positive straight leg raising could be consistent with subjective complaints of pain and abnormal x-rays, MRIs, and EMGs, and cause limitations. (Tr. 133-36; see 561.) Dr. Manders, however, explained that straight leg raising was not considered a very definitive neurological test. (Tr. 134-35.)

### iv. Vocational Expert's Testimony

Andrew Vaughn testified as a vocational expert at the Initial Hearing. (Tr. 97-100, 215.) He testified that plaintiff's past work as a locksmith and small business owner was considered "light" work. (Tr. 99.) He further testified that plaintiff's work as a locksmith and small business owner and his educational level would not have allowed plaintiff to acquire skills that would have been transferrable outside of the locksmith field to other sedentary jobs. (Tr. 99-100.)

**STANDARDS OF REVIEW**

### I. JUDICIAL REVIEW OF THE SSA'S COMMISSIONER'S DETERMINATIONS

A district court does not review *de novo* the Commissioner's determination of whether or not a claimant is disabled. *See Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). Rather, a district court "may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based

on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir.
2008) (internal quotation marks omitted); *Butts v. Barnhart*, 388
F.3d 377, 386 (2d Cir. 2004). Substantial evidence is "more than
a mere scintilla. It means such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion." *Moran v.
Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). The reviewing court
must be certain that the ALJ considered all the evidence when
assessing the legal standards and evidentiary support used by the
ALJ in his disability finding. 20 C.F.R. § 404.1520(a)(3).

"The court shall have power to enter, upon the pleadings
and transcript of the record, a judgment affirming, modifying, or
reversing the decision of the Commissioner of Social Security,
with or without remanding the cause for a rehearing." 42 U.S.C.
§ 405(g). The reviewing court is authorized to remand the
Commissioner's decision to allow the ALJ to further develop the
record, make more specific findings, or clarify his rationale.
*See Grace v. Astrue*, No. 11-cv-9162, 2013 WL 4010271, at *14
(S.D.N.Y. July 31, 2013); *Butts v. Barnhart*, 388 F.3d 377, 385–86
(2d Cir. 2004) ("Where the administrative record contains gaps,
remand to the Commissioner for further development of the evidence
is appropriate."). *See also Lopez v. Sec'y of Dept. of Health and
Human Servs*, 728 F.2d 148, 150–51 (2d Cir. 1984) ("We have remanded
cases when it appears that the ALJ has failed to consider relevant
and probative evidence which is available to him."); *Cutler v.*

*Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) (indicating that courts may remand the decision when evidence "was not explicitly weighed or considered by [the ALJ], although such consideration was necessary to a just determination of a claimant's application") (internal citations omitted).

## II. LEGAL STANDARDS GOVERNING SSA DISABILITY DETERMINATIONS

"To receive federal disability benefits, an applicant must be 'disabled' within the meaning of the Social Security Act." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). A claimant is disabled under the Act when he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA has promulgated a "five-step sequential evaluation" to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). If at any step of the five-step sequential evaluation the Commissioner can determine whether a claimant is disabled, the evaluation ends at that step. *Id.; DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011).

### A. Determining Disability Through the Five-Step Evaluation

#### i. Step One

At step one, the Commissioner determines whether the claimant is currently engaged in substantial gainful employment.

20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently engaged in substantial gainful employment, then the claimant is not disabled "regardless of medical condition." 20 C.F.R. § 404.1520(b). Otherwise, the Commissioner moves to step two. 20 C.F.R. § 404.1520(a)(4)(ii).

### ii. Step Two

Step two requires the Commissioner to determine whether the claimant has a "severe medically determinable physical or mental impairment" that meets the SSA's duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii). The SSA's "duration requirement" states that, "unless [a claimant's] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509.

An impairment must "result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508. The burden is on the claimant to provide medical evidence to support his claim that he or she suffers from a disabling impairment and, to meet this burden, the claimant must provide reports about the impairment from "acceptable medical sources." 20 C.F.R. §§ 404.1513(a). Subjective symptoms alone are insufficient to establish a physical or mental impairment. 20 C.F.R. § 404.1528(a).

"The Commissioner is required to consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to establish eligibility for Social Security benefits." *Burgin v. Astrue*, 348 F. App'x 646, 647 (2d Cir. 2009) (internal quotations omitted). "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Such "basic work activities" include: walking; standing; sitting; lifting; pushing; pulling; reaching; carrying; handling; seeing; hearing; speaking; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). In assessing severity, the Commissioner will not consider a claimant's "age, education, and work experience." 20 C.F.R. § 404.1520(c).

### iii. Step Three

If the impairment is medically severe and satisfies the "duration requirement" under step two, then the Commissioner will move onto step three. 20 C.F.R. § 404.1520(a)(4)(ii). At step three the Commissioner determines whether the claimant's impairments meet or equal one of the "Listing of Impairments" found in 20 C.F.R. Part 404, Subpart P, Appendix I. 20 C.F.R. §

404.1520(a)(4)(iii).  These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment.  If a claimant's condition "meets or equals" one of the "listed" impairments, he or she is *per se* disabled and entitled to benefits, irrespective of his or her "age, education, and work experience," and the sequential evaluation ends.  *Id.*; 20 C.F.R. § 404.1520(d).

### iv. Step Four

If the claimant's impairments do not "meet or equal" one of the "Listing of Impairments" under step three, then the Commissioner must proceed to the fourth step:  assessing the individual's "residual functional capacity," ("RFC") *i.e.*, his or her capacity to engage in basic work activities, and deciding whether the claimant's residual functional capacity permits the claimant to engage in his or her "past relevant work." 20. C.F.R. § 404.1520(a)(4)(iv); 20. C.F.R. § 404.1520(e).  If it is determined that the claimant can perform their past relevant work, the Commissioner will find that the claimant is not disabled.  20. C.F.R. § 404.1520(a)(4)(iv).

### v. Step Five

The fifth and final step is a determination of whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy."

*Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995); 20. C.F.R. § 404.1520(a)(4)(v). Because the claimant must prove his case at steps one through four, the claimant bears the "general burden of proving . . . disability." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). At the fifth step, however, the burden shifts from the claimant to the Commissioner, requiring the Commissioner to show that in light of the claimant's RFC, "age, education, and work experience," he or she is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F.Supp. 300, 310 (E.D.N.Y.1997). In making that determination, the Commissioner need not provide additional evidence about the claimant's RFC, but may rely on the same assessment that was applied in step four's determination of whether the claimant can perform his or her past relevant work. *See* 20 C.F.R. § 404.1560(c)(2); *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

**B. Calculating the "Date Last Insured"**

Not only must a claimant establish that he is disabled, but he must also establish that he is insured for disability benefits and that he became disabled prior to the expiration of his disability insured status. 42 U.S.C. §§ 423(a)(1)(A), 423(a)(1)(D), 423(a)(1)(E), 423(c), 423(d); *see also Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989); *Serrano v. Astrue*, No. 05 Civ. 1356, 2008 WL 2622927, at *4 (E.D.N.Y. July 1, 2008).

Generally, a claimant is disability insured when he has accrued 20 quarters of coverage during the 40-quarter (10-year) period preceding his onset date of disability.[8] *See* 20 C.F.R. § 404.130; *see also Butts v. Sec'y of Health and Human Servs.*, 706 F.2d 107, 107 (2d Cir. 1983). "For someone who works continuously for at least five years and then [completely] stops working, this means that the person must have last worked at most five years before the date of application. The final day of the final quarter satisfying these requirements is referred to as the 'date last insured.'" *Silverman v. Colvin*, No. 13-CV-3062, 2014 WL 198767, at *3 (E.D.N.Y. Jan. 16, 2014).

**III. The ALJ's Decision**

Applying the five-step sequential analysis for disability claims outlined above, the ALJ concluded at step one that the plaintiff did not engage in substantial gainful activity at any time between plaintiff's alleged onset date of January 1, 2002 and December 31, 2005, his date last insured for disability benefits. (Tr. 29.)

At step two, the ALJ determined that through the date last insured, plaintiff had the following medically determinable impairments: degenerative disc disease of the cervical and lumbar spines, early radiculopathy involving L4-L5 and L5-S1 motor roots

---

[8] The 20/40 requirement applies to those who allege disability onset after the age of thirty-one, have not had a previous disability prior to the age of thirty-one, and are not statutorily blind. *See* 20 C.F.R. § 404.130.

bilaterally, and mild right median sensory and mild bilateral tibial motor nerve compromise with consideration of right carpal tunnel release. (*Id.*) After thorough examination of the record and evaluation of plaintiff's subjective testimony, the ALJ found that plaintiff's degenerative disc disease of the cervical and lumbar spines, early radiculopathy involving L4-L5 and L5-S motor roots bilaterally, and mild right median sensory and mild bilateral tibial motor nerve compromise with consideration of right carpal tunnel release were not sufficiently severe to substantiate plaintiff's disability claim. (Tr. 30-35.)

The ALJ found that the impairments, on their own or in combination, did not significantly limit plaintiff's ability to perform basic work-related activities for a continuous period of twelve months through December 31, 2005. (Tr. 35.) By finding that plaintiff failed to provide sufficient medical evidence to establish his disability claim, the ALJ then concluded that the claimant was not disabled during the relevant period from January 1, 2002 to December 31, 2005. (*Id.*) The ALJ rejected Dr. Gasalberti opinion that claimant had a RFC consistent with less than sedentary work. (Tr. 33.) The ALJ relied on Dr. Manders, the medical expert, and instead gave Dr. Manders' opinion great weight. (Tr. 34.) The ALJ found Dr. Manders' explanations as to why he determined that plaintiff did not have severe impairment(s) were persuasive and consistent with the objective medical evidence

in the record.  (Tr. 31, 32-33, 34.)

        The ALJ gave no weight to Dr. Sharon's opinion that plaintiff could not perform even sedentary work since 2005, because Dr. Sharon did not treat claimant at that time and Dr. Sharon's opinion was without basis.  (Tr. 34.)  The ALJ also accorded no weight to Dr. Silverman's opinion that claimant was totally disabled from work during the relevant period because his opinion was not supported by any evidence.  (*Id.*)  The ALJ noted that the determination of the claimant's RFC and the ultimate question of disability was reserved for the SSA.  (Tr. 34-35.)  Little probative weight was afforded to plaintiff's testimony about his symptoms because it was not supported by the medical evidence in the record and because plaintiff's testimony at various points was inconsistent both internally and with other information in the record.  (Tr. 34, 35.)

## Analysis

        For the reasons stated below, the court finds that the ALJ's decision was supported by substantial evidence; the ALJ reviewed the entire record and properly applied the correct legal standards.  Accordingly, the ALJ's decision is affirmed.

### I.   The ALJ Properly Applied Step One

        Neither party challenges the ALJ's finding at step one that the plaintiff was not engaged in "substantial gainful activity" during the relevant period.  (Tr. 29; ECF No. 16, Def.

Br. at 29; ECF No. 18, Pl. Opp. at 21.)  Plaintiff reported that he closed his business in 2000 and has remained unemployed since then.  (Tr. 82-83.)  Thus, as confirmed by his earnings record, plaintiff last met insured status under the Act on December 31, 2005, five years after the quarter he last worked.  (Tr. 29, 247-253.); *see* 20 C.F.R. § 404.130; *Silverman*, 2014 WL 198767 at *3.  Plaintiff remained unemployed after December 2000, therefore the ALJ found that plaintiff had not engaged in substantial gainful activity during the relevant period—that is from the alleged onset date of his disability, January 1, 2002 through the date he last met insured status on December 31, 2005.  (Tr. 29); 20 C.F.R. § 404.1571.  Accordingly, the court finds that the ALJ's step one finding was supported by substantial evidence.

## II.  The ALJ's Step Two Analysis was Proper

The court finds that the ALJ, at step two, correctly applied the proper legal standard and his determination that plaintiff's impairments were not severe, was supported by substantial evidence.  At step two, the ALJ evaluated whether the claimant had severe medically determinable physical or mental impairments and, if so, whether the impairments or combination of impairments "lasted or [could] be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1509; 20 C.F.R. § 404.1520(a)(4)(ii).  The ALJ evaluated all the evidence and determined that although plaintiff did have some impairments, his

combination of impairments were not severe and did not significantly limit his ability to do basic work activities, nor did his combinations of impairments last for a continuous period of at least 12 months. (Tr. 35.)

## A. SUBSTANTIAL EVIDENCE SUPPORTED THE ALJ'S SEVERITY FINDING

The ALJ found, and the court agrees, that plaintiff failed to carry his burden of demonstrating severe medical impairment(s) that prevented him from performing his past work. While the evidence indicates that plaintiff may have had some impairments, the evidence does not indicate that any of these impairments singly, or in combination, impeded plaintiff's ability to perform basic work during the relevant period. In determining the severity of plaintiff's condition, the ALJ reviewed the entire administrative record which included medical records, the medical opinions of plaintiff's treating physicians and the medical expert, as well as plaintiff's testimony about his symptoms, and the opinion of a vocational expert. (Tr. 30-35.) Consequently, the court finds that the ALJ's decision is supported by substantial evidence.

### i. Weight Assigned to Treating Physicians

The ALJ gave little or no weight to the opinions of plaintiff's three treating physicians, Dr. Silverman, Dr. Gasalberti and Dr. Sharon. The court finds that the ALJ provided "good reasons" for weights accorded to Drs. Silverman, Gasalberti

and Sharon.

SSA regulations require that every medical opinion in the administrative record be evaluated, regardless of the source, when determining whether a claimant is disabled under the Act. 20 C.F.R. § 404.1527(c). "Acceptable medical sources" that may evidence an impairment include, *inter alia*, a claimant's licensed treating physicians and licensed or certified psychologists. 20 C.F.R. § 404.1513(a). The opinion of a specialist regarding issues related to his area of specialty will generally be afforded greater weight than that of a non-specialist, 20 C.F.R. § 404.1527(c)(5), and a source's familiarity with the Commissioner's disability program and evidentiary requirements also accords greater weight. 20 C.F.R. § 404.1527(c)(6).

The "treating physician rule," instructs the Commissioner to give "controlling weight" to a treating source's opinion on the "nature and severity" of a claimant's impairments as long as the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The opinion of the treating physician, however, is not afforded controlling weight where the treating physician's opinions are not consistent with other substantial evidence in the record, such as the opinions of other medical experts. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d

Cir. 2002); *see also Halloran v. Barnhart*, 362 F.3d 28 (2d Cir. 2004) (denying controlling weight to the treating physician, because the treating physician's opinion was not informative or consistent with the opinions of other medical experts). Although a treating physician's opinion about whether a claimant is disabled will be considered by the ALJ, the final responsibility for determining disability is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(2); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative.").

If the Commissioner denies the treating source's opinion controlling weight, the Commissioner is required to "always give good reasons" for the weight accorded. 20 C.F.R. § 404.1527(c)(2). The "ALJ can give the treating physicians' opinions less than controlling weight only if they are not well supported by medical findings or are inconsistent with other substantial evidence in the record." *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 628 (S.D.N.Y. 2006). If the Commissioner does not provide "good reasons," it is appropriate for the reviewing court to remand. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[T]he Commissioner's failure to provide 'good reasons' for apparently

affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

Dr. Silverman's opined in his July 2011 letter that plaintiff was "totally disabled" from March 5, 2004 through September 13, 2004. (Tr. 34, 340.) The ALJ rejected Dr. Silverman's determination that plaintiff was "totally disabled" during March through September 2004 because (1) the doctor's statement was not supported by any evidence and (2) because making the final determination as to whether a claimant is disabled is reserved for the SSA. (Tr. 34-35.) Consequently, the court finds that the ALJ gave "good reasons" for not giving controlling weight to Dr. Silverman's opinion, and holds that this finding was supported by substantial evidence. *See Cabassa v. Astrue*, No. 11-CV-1449 KAM, 2012 WL 2202951, at *7 (E.D.N.Y. June 13, 2012) ("The source of an opinion on [the ultimate question of disability] is thus not given 'controlling weight' or 'special significance' under the regulations.") (quoting *Arruda v. Comm'r of Soc. Sec.*, 363 F. App'x 93, 95-96 (2d Cir. 2010) (summary order)); *see also* 20 C.F.R. §§ 404.1527(d)(1)("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."); *Halloran*, 362 F.3d at 28 (2d Cir. 2004) (denying controlling weight to the

treating physician, because the treating physician's opinion was not informative or consistent with the opinions of other medical experts); *Pereira v. Astrue*, 279 F.R.D. 201, 206 (E.D.N.Y. 2010) ("The treating physician rule does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, such as the opinions of other medical experts." (internal quotation marks omitted)).

The ALJ also rejected Dr. Gasalberti's April 2012 functional assessment restricting plaintiff to less than sedentary work from October 31, 2005 to the present. (Tr. 33, 434-35.) In rejecting Dr. Gasalberti's assessment, the ALJ found that Dr. Gasalberti's treatment notes from the relevant period, did not indicate the presence of a severe impairment lasting for twelve consecutive months on or before December 31, 2005. (Tr. 32-33.) The ALJ relied on Dr. Mander's testimony which highlighted that Dr. Gasalberti, in October 2005, found that plaintiff had full (5/5) strength in the upper and lower extremities; intact sensation in the upper extremities; and symmetrical deep tendon reflexes; along with functional range of motion of plaintiff's upper extremities, hips, knees, and ankles. (Tr. 32-33, 560-61.) The remainder of Dr. Gasalberti's treatment notes from the relevant period indicated a reduced range of lumbar motion, but full 5/5 strength in plaintiff's lower extremities. Dr. Gasalberti's records did not indicate further sensation deficits; rather, Dr.

Gasalberti's notes repeatedly indicated that plaintiff was neurologically intact. (*See* Tr. 540-49.) Further, a November 2005 EMG of plaintiff's upper extremities was normal, with no evidence of cervical radiculopathy. (Tr. 32, 552.)

The ALJ noted that Dr. Manders found that there were no clinical grounds establishing that plaintiff had a severe impairment during the relevant period. (Tr. 33, 112-13.) The ALJ found Dr. Mander's testimony to be persuasive after Dr. Manders explained his rationale for his opinion, and thus, gave Dr. Manders' opinion great weight. (Tr. 33, 121-25.) Consequently, the ALJ rejected Dr. Gasalberti's opinion that from 2005 to the present, plaintiff had a residual functional capacity consistent with less than sedentary work. (Tr. 33.) The court finds that the ALJ gave "good reasons" for according less weight to Dr. Gasalberti's opinion and finds that the decision was supported by substantial evidence. *See Halloran*, 362 F.3d at 28 (2d Cir. 2004) (denying controlling weight to the treating physician, because the treating physician's opinion was not informative or consistent with the opinions of other medical experts); *Pereira*, 279 F.R.D. at 206 (holding that the treating physician's opinion is accorded less weight "when the treating physician's opinion is inconsistent with the other substantial evidence in the record, such as the opinions of other medical experts") (internal quotation marks and citations omitted).

Dr. Sharon, plaintiff's third treating physician, began treating plaintiff in July 2010, almost five years after the date last insured. (Tr. 362.) Dr. Sharon opined that plaintiff could not perform even sedentary work since 2005. The ALJ gave Dr. Sharon's opinion no weight because his opinion was not supported by any evidence and Dr. Sharon did not treat plaintiff during the relevant period. (Tr. 34.) The court finds that the ALJ provided "good reasons" for giving no weight to Dr. Sharon's opinion because it was not supported by medical evidence. *See Halloran*, 362 F.3d at 28 (denying controlling weight to the treating physician, because the treating physician's opinion was not informative or consistent with the opinions of other medical experts).

### ii. Weight Assigned to Medical Expert

The ALJ's decision to give controlling weight to the opinion of the medical expert, Dr. Manders, was proper. (Tr. 34.) The opinion of a specialist regarding issues related to his area of specialty will generally be afforded greater weight, 20 C.F.R. § 404.1527(c)(5), and a source's familiarity with the Commissioner's disability program and evidentiary requirements also accords greater weight. 20 C.F.R. § 404.1527(c)(6). An ALJ may "ask for and consider opinions from medical experts on the nature and severity of [an individual's] impairment(s)." 20 C.F.R. § 404.1527(e)(2)(iii). Medical experts are highly qualified professionals who are experts in the evaluation of medical issues

in disability claims under the Act, and their opinion may constitute substantial evidence in support of a denial of benefits, where, as here, the opinion is supported by the evidence of record. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993).

The ALJ noted that Dr. Manders is a certified neurosurgeon and pain management physician; he provided his opinion as a specialist with an understanding and extensive experience with the SSA's disability program and its requirements. (Tr. 34.) After reviewing the entire record, Dr. Manders found that plaintiff did not have any severe physical impairments on or before December 31, 2005, and that plaintiff's only limitation was "prolonged ambulation over one hour at a time." (Tr. 647, 654.) Dr. Manders was cross-examined by plaintiff's counsel at the Supplemental Hearing and provided explanations for his findings.

The ALJ concluded, after hearing Dr. Manders' testimony, that Dr. Manders reviewed the entire record and, in the face of thorough cross examination, provided sufficient explanations for his opinion. (*See* Tr. 31, 33-34.); 20 C.F.R. §§ 404.1527(c)(3) (well-supported medical source opinion entitled to more weight than unsupported medical source opinion; for non-examining sources, "the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions"), 404.1527(c)(4) ("The more consistent an opinion is

with the record as a whole, the more weight" it deserves.). The
ALJ also gave Dr. Manders' opinion controlling weight because Dr.
Manders was familiar with the agency's standards for determining
disability, he was an expert on the topics on which he opined, and
because his opinions were supported by the medical evidence. (Tr.
31, 33-34.) The court finds that the ALJ applied the proper legal
standards and the weight accorded to Dr. Manders' opinion was
supported by substantial evidence. *See id.; see also Selian v.
Astrue,* 708 F.3d 409, 418 (2d Cir. 2013) (In the Second Circuit,
"to override the opinion of [a] treating physician . . . the ALJ
must explicitly consider . . . whether the physician is a
specialist."); *LaClair v. Colvin*, No. 6:12-CV-816 GLS, 2013 WL
5218067, at *2 n.4 (N.D.N.Y. Sept. 16, 2013) (finding that an ALJ
properly considered the expert's knowledge of the SSA's disability
programs when determining the amount of weight to accord the
expert's opinion).

### iii.  The ALJ's Assessment of Plaintiff's Subjective Symptoms

Lastly, in assessing severity, the ALJ also considered
plaintiff's testimony about his subjective complaints and
limitations. (Tr. 33-34.) In evaluating the claimant's alleged
symptoms and functional limitations for the purposes of step two,
the ALJ must follow a two-step process, first determining whether
the claimant has a "medically determinable impairment that could

reasonably be expected to produce [the claimant's alleged] symptoms." 20 C.F.R. §§ 404.1529(b); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). "In determining whether there is an underlying medically determinable impairment that could reasonably be expected to produce an individual's symptoms, [the SSA does not] consider whether the severity of an individual's alleged symptoms is supported by the objective medical evidence." S.S.R. 16-3P, 2016 WL 1119029, at *3. Second, the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); *Genier*, 606 F.3d at 49. The ALJ must consider the entire case record, including objective medical evidence, a claimant's statements about the intensity, persistence, and limiting effects of symptoms, statements and information provided by medical sources, and any other relevant evidence in the claimant's record. S.S.R. 16-3P, 2016 WL 1119029, at *4-6; *Genier*, 606 F.3d at 49. The evaluation of a claimant's subjective symptoms is not an evaluation of the claimant's character. S.S.R. 16-3P, 2016 WL 1119029, at *1.

When evaluating plaintiff's symptoms, the ALJ found at the first step that plaintiff had the following determinable impairments: degenerative disc disease of the cervical and lumbar spines, early radiculopathy involving L4-L5 and L5-S1 motor roots

bilaterally, and mild right median sensory and mild bilateral tibial motor nerve compromise with consideration of right carpal tunnel release. (Tr. 29.)

Next the ALJ evaluated the intensity and persistence of plaintiff's symptoms and then determined the extent to which the symptoms limited his ability to perform work-related activists. 20 C.F.R. §§ 404.1529(c). Here, the ALJ evaluated the entire case record and found that the totality of the medical evidence did not corroborate plaintiff's subjective testimony of his symptoms prior to December 31, 2005. (Tr. 34-35.) The ALJ cited the relatively conservative treatment and the lack of significant complaints by plaintiff during the relevant period, and the statements made by plaintiff that conflicted with other evidence in the record. (Tr. 33-34.) As discussed in greater detail above, plaintiff alleged that he became disabled in January 2002, but did not seek treatment from Dr. Silverman for the first time until March 2004, more than two years later. Further, more than a year elapsed between the last examination by Dr. Silverman in September 2004, and when plaintiff first saw Dr. Gasalberti in October 2005. Moreover, plaintiff did not seek, nor did he receive, medical treatment or physical therapy as recommended by his doctors for nine months in 2006; plaintiff traveled abroad for six of those months. These treatment gaps undermined plaintiff's claim that his impairments were severe on and before December 31, 2005. Therefore, the ALJ

reasonably found that plaintiff's medical history during the relevant period was not consistent with plaintiff's subjective testimony about his symptoms. (*See* Tr. 34); S.S.R. 16-3P, 2016 WL 1119029, at *8 ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."); *Moscatiello v. Apfel*, 129 F. Supp. 2d 481, 489 (E.D.N.Y. 2001) ("The ALJ is permitted to attach significance to plaintiff's failure to seek medical treatment.")(quotation marks and citation omitted.)

Further, the ALJ noted that, during the relevant period, the record did not show plaintiff making significant complaints or indicating that his ability to perform basic work activities was limited. (Tr. 34; *see* Tr. 318-29, 540-63.) The first time in the record that plaintiff complained of any difficulty with prolonged standing or walking was not until July 2007, well after the December 2005 close of the relevant period. (*See* Tr. 515.) Although the ALJ made a credibility determination that S.S.R. 16-3P no longer permits, the court finds that the ALJ's evaluation of plaintiff's subjective testimony otherwise comported with the

standards set forth in S.S.R. 16-3P.[9] *See generally* S.S.R. 16-3P, 2016 WL 1119029. Accordingly, the court finds that the ALJ's determination that, during the relevant period, despite plaintiff's subjective complaints, there was no indication that the plaintiff's medically determinable impairments significantly limited his ability to perform basic work activities was supported by substantial evidence. *See* 20 C.F.R. § 404.1529(a) (A claimant's statements of his own pain symptoms will not alone conclusively establish disability; the claimant's subjective complaints must also be supported by objective medical evidence.); *Genier*, 606 F.3d at 49.

## B. SUBSTANTIAL EVIDENCE SUPPORTED THE DURATIONAL FINDINGS

Substantial evidence supported the ALJ's conclusion that plaintiff failed to establish that his physical impairments interfered with his ability to perform basic work activities for a continuous period of at least twelve months during the relevant period from January 1, 2002 to December 31, 2005. (Tr. 35.) The SSA's duration requirement states that, "unless [a claimant's]

---

[9] Although the regulations have not been altered, the Commissioner issued a new Social Security Ruling, S.S.R. 16-3p, in March 2016. The purpose of this Ruling is to provide "guidance about how [to] evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims." S.S.R. 16-3P, 2016 WL 1119029, at *1. The Ruling supersedes the 1996 Ruling, S.S.R. 96-7p, which placed a stronger emphasis on the role of the adjudicator to make a "finding about the credibility of the individual's statements about the symptom(s) and its functional effects." S.S.R. 96-7P, 1996 WL 374186, at *1. S.S.R. 16-3p, in contrast sets forth "a more holistic analysis of the claimant's symptoms, and 'eliminates the use of the term credibility.'" *Acosta v. Colvin*, No. 15-CV-4051, 2016 WL 6952338, at *18 (S.D.N.Y. Nov. 28, 2016) (quoting S.S.R. 16-3P, 2016 WL 1119029, at *1).

impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509.

First, the ALJ reviewed all of the evidence in the record. (Tr. 34.) The ALJ then found that certain records did not pertain to the period at issue from January 1, 2002, the alleged onset date, to December 31, 2005, the date last insured, and did not analyze those records in arriving at his determination.[10] (Tr. 31.)

Although, plaintiff alleged that he became disabled after a fall in January 2002, plaintiff did not visit a doctor for his alleged injuries until March 5, 2004. (Tr. 31, 326.) After his last visit to Dr. Silverman in September 2004, plaintiff did not seek or receive treatment for more than a year. (Tr. 329.) Plaintiff only began treatment with Dr. Gasalberti on October 31, 2005; plaintiff reported then that he had just hurt his back two or three weeks earlier and developed back and radicular pain. (Tr. 32, 559-63.) In December 2005, plaintiff received lumbar epidural steroid injections, after which plaintiff stated that his radicular symptoms had improved. (Tr. 32, 544, 549.)

Plaintiff saw Dr. Gasalberti on few occasions between

---

[10] In assessing plaintiff's ability to perform basic work-related functions prior to the date last insured, December 31, 2005, the ALJ noted that "exhibits 3F, 4F, 7F, 9F, 10F, 12F, 14F, 15F, 19F, 20F, 21F, and 22F are not relevant to the period at issue and will not be analyzed." (Tr. 31.)

January 2006 and March 2006. (Tr. 32, 527-539.) After plaintiff's March 30, 2006 visit, however, plaintiff discontinued treatment for nine months until December 2006. (Tr. 525.) Plaintiff was abroad for six months after March 2006; he received no treatment while he was overseas. He did not return for follow up visits or attend physical therapy as Dr. Gasalberti had previously recommended. (*Id*.) Plaintiff provided no explanation for these treatment gaps. During the relevant period, plaintiff had the means to seek treatment. Plaintiff stated that he could drive a car and also had a brother and wife that took him to visit relatives or to medical appointments. (Tr. 90-91.)

In sum, although the administrative record indicates that plaintiff had some impairments during the relevant period, between January 1, 2002 and December 31, 2005, the impairments or combination of impairments were not severe and did not last and could not be expected to last for a continuous period of at least 12 months. Plaintiff failed to carry his burden of proving that his impairments were present and sufficiently severe for at least twelve months, as required by the regulations. *Feliciano v. Colvin*, No. 12 CIV. 6202 PGG RLE, 2015 WL 1514507, at *6 (S.D.N.Y. Mar. 31, 2015) (It is the petitioner's burden to establish as of alleged onset date a physical impairment that has lasted or could be expected to last for a continuous period of not less than 12 months.) (internal quotation marks omitted). Consequently, the

court finds that the ALJ's finding that plaintiff failed to meet the durational requirement was supported by substantial evidence.

## III.  The ALJ Properly Applied the Five-Step Analysis

Given the ALJ's determination that plaintiff's conditions did not rise to the level of severe impairments under step two of the disability analysis, and that consequently plaintiff was not disabled, the ALJ was not required to proceed to steps three through five. *See* 20 C.F.R. § 404.1520(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe . . . impairment that meets the duration requirement . . . we will find that you are not disabled."); 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination . . . and we do not go on to the next step."); *Feliciano*, 2015 WL 1514507, at *7 (holding that the ALJ was not required to move on to evaluate further steps after determining plaintiff's failure to establish severity under step two); *Houston v. Colvin*, No. 12-CV-03842 (NGG), 2014 WL 4416679 (E.D.N.Y. Sept. 8, 2014) (same). Accordingly, the court finds that the ALJ properly applied the regulations by foregoing steps three to five of the five-step disability analysis.

## CONCLUSION

For the foregoing reasons, the court finds that the Commissioner applied the proper legal standards when finding that plaintiff was not disabled because he did not have medically determinable severe impairment(s), which had lasted or could be expected to have lasted for a continuous period of at least twelve months, from January 1, 2002, the alleged onset date, through December 31, 2005, the date last insured. The Commissioner's decision was supported by substantial evidence in the record. Accordingly, the defendant's Motion for Judgment on the Pleadings is **GRANTED**, plaintiff's Cross-Motion for Judgment on the Pleadings is **DENIED**, and the decision of the ALJ is **AFFIRMED**. The Clerk of Court is respectfully directed to enter judgment for the defendant and close this case.

**SO ORDERED.**


Dated:     February 16, 2017
           Brooklyn, New York

                                    _____  ____/s/_____
                                    Kiyo A. Matsumoto
                                    United States District Judge